UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x
ANDRE CLEMMONS,

               Petitioner,

      -against-

WILLIAM E. LEE,

               Respondent.
---------------------------------------------------------x

ORDER

No. 13-CV-4969 (CS) (JCM)

Seibel, J.

      Before the Court are the Objections of Petitioner Andre Clemmons, (ECF No. 71 ("Obj.")), to the Report and Recommendation of United States Magistrate Judge Judith C. McCarthy, (ECF No. 68 (the "R&R")), recommending that his petition under 28 U.S.C. § 2254 be denied. I presume the parties' familiarity with the underlying facts, the prior proceedings in the state courts and before the Magistrate Judge, and the standards governing § 2254 petitions.

      A District Court reviewing a report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). The district court "may adopt those portions of the report to which no 'specific, written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *Adams v. N.Y. State Dep't of Educ.*, 855 F. Supp. 2d 205, 206 (S.D.N.Y. 2012) (quoting Fed. R. Civ. P. 72(b)) (citing *Thomas v. Arn*, 474 U.S. 140, 149 (1985)). "A party that objects to a report and recommendation must point out the specific portions of the report and recommendation to which they object." *J.P.T. Auto., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 659 F. Supp. 2d 350, 352 (E.D.N.Y. 2009). If a party fails to object to a particular portion of a report and recommendation,

further review thereof is generally precluded. *See Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002). The court must review *de novo* any portion of the report to which a specific objection is made. *See* 28 U.S.C. § 636(b)(1)(C); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997). When a party makes only conclusory or general objections, or simply reiterates the original arguments made below, a court will review the report only for clear error. *Alaimo v. Bd. of Educ.*, 650 F. Supp. 2d 289, 291 (S.D.N.Y. 2009). "Furthermore, [even] on *de novo* review, the Court generally does not consider arguments or evidence which could have been, but were not, presented to the Magistrate Judge." *United States v. Vega*, 386 F. Supp. 2d 161, 163 (W.D.N.Y. 2005).

Here Petitioner objects only as to the Magistrate Judge's findings in connection with his claims of prosecutorial misconduct, false testimony and a *Brady/Giglio* violation relating to the status of the plea agreement of witness Calvin Davis.

In September 2006 Davis was indicted for criminal possession of a weapon in the third degree and falsely reporting an incident in the third degree, after he accidentally shot himself but falsely told the police he was shot by someone else. (Whitesell Aff. ¶ 6; Davis Plea at 2-3.)[1] Davis lived near the scene of a shooting that had occurred on July 30, 2006, and the police repeatedly pressed him to cooperate, but he declined. (Tr. 435-36, 458-59, 492, 542-43.)[2] On April 2, 2007, the day before he was set to go to trial, he reached an agreement with the

---

[1] "Whitesell Aff." refers to the Affirmation of former Assistant District Attorney ("ADA") Edward Whitesell, which is located at pages 39-41 of ECF No. 49. "Davis Plea" refers to the transcript of Davis' guilty plea, which is located at pages 17-31 of ECF No. 49.

[2] "Tr." refers to the transcript of Petitioner's trial. (ECF Nos. 18-20.) "JS Tr." refers to the transcript of the jury selection. (ECF No. 17.)

prosecutor. (Davis Plea at 2.) The agreement was apparently never reduced to writing, but ADA Whitesell placed its terms on the record in the County Court. In exchange for Davis' plea to his pending charges, his truthful testimony before the grand jury regarding the July 30, 2006 shooting with which Petitioner was eventually charged, and his cooperation with the prosecution at any trial, the prosecution agreed to thereafter dismiss the original charges against Davis and file a misdemeanor information in the City Court charging falsely reporting an incident in the third degree, to which Davis agreed to plead guilty. The prosecution further agreed that Davis would be released on bail after his grand jury testimony the following day, and that it would agree to a sentence of time served. (*Id.* at 3-4; Tr. 434-35.) Davis and his lawyer assented to the ADA's summary, (Davis Plea at 4), and Davis pleaded guilty as outlined, (*id.* at 21-30).

Following his grand jury testimony on April 3, 2007, Davis was released on bail, but was rearrested on November 29, 2007 and charged with petit larceny. (Whitesell Aff. ¶ 9; Tr. 434-35.) According to Whitesell, after Davis' arrest Whitesell informed Davis that the arrest was a violation of the plea agreement, given that Whitesell had told Davis following his grand jury testimony that he was not to get rearrested. (Whitesell Aff. ¶ 9.) Davis nevertheless agreed to testify at Petitioner's trial, (*id.* ¶ 10), and his testimony about the status of the agreement was consistent with Whitesell's affirmation. Davis told the jury, in substance and among other things, that his cooperation deal had been conditioned on his not getting rearrested; that his new arrest had therefore breached the agreement; that he expected a three-and-a-half to seven year sentence; and that he was testifying because it was the right thing to do. (Tr. 435-37, 468, 542.)

After Petitioner's trial, however, according to Whitesell, he decided to honor the agreement with Davis after all. He did so based on Davis's cooperation, the circumstances of the

3

petit larceny offense, and the fact that Davis's possession of a weapon had injured only himself. (Whitesell Aff. ¶ 10.)  The felony indictment was dismissed on March 28, 2008; Davis's case was then returned to City Court; Davis pleaded guilty in City Court to false reporting and was sentenced to time served on March 31, 2008; and Davis was also required to plead guilty to petit larceny, which he did on April 1, 2008.  (*Id.* ¶ 10.)  Whitesell did not indicate to Davis, before his testimony at Petitioner's trial, that he would honor the original agreement despite the new arrest. (*Id.* ¶ 11.)

  Petitioner argues that there was in fact no condition that Davis not be rearrested; that Whitesell had no authority to revoke the agreement based on an unstated condition; that the plea agreement therefore remained valid despite the new arrest; that Davis testified falsely when he said the deal was off; that Whitesell engaged in misconduct, and violated his obligations under *Brady* and *Giglio*, when he did not correct Davis's testimony; that the jury was misled by the false testimony into thinking that Davis had no motive to curry favor with the prosecution; and that the outcome of the trial would have been different had the jury received accurate information.  (Obj. ¶¶ 8-22, 38, 40, 43-51.)  Judge McCarthy rejected this argument, finding that Petitioner had not shown that Davis' testimony was false. She found that while Davis "ultimately received the benefit he told the jury he forfeited by being rearrested," (R&R at 48), Whitesell's affirmation showed that Davis's testimony accurately reflected the state of affairs at the time he testified, and that Petitioner's speculation was insufficient to overcome the sworn statements of both Whitesell and Davis, (*see id.* at 48-49).  Judge McCarthy further found that – given the weight of the evidence other than Davis's testimony, Davis's explanation of the deal and why he initially agreed to testify, and the judge's instructions to carefully scrutinize the testimony of

4

witness who may hope for a benefit – any misrepresentation regarding Davis's agreement would not have affected the outcome. (*See id.* at 49-51.)

Petitioner's main objection is to Judge McCarthy's conclusion that Plaintiff has not shown that Davis' testimony regarding his agreement was false. He points out that no mention of a no-rearrest condition was placed on the record at Davis' plea and there was no court proceeding at which Davis and his attorney were told that the agreement was void. Thus, according to Petitioner, the only evidence that the deal had been invalidated is Whitesell's word, and the jury was misled into thinking that Davis had no interest in pleasing the District Attorney and nothing to gain from his testimony. He contends that as a legal matter, the ADA did not have the right to void Davis' agreement based on a supposed violation of a term that was never explicitly set forth, and thus Davis' testimony that the deal was off had to have been false.

The flaw in Petitioner's reasoning is that what mattered at trial in terms of Davis's incentives was not the legality of the revocation of the deal, or what occurred after trial, but what Davis *believed* at the time he testified. Petitioner seems to be correct that the no-rearrest condition was never put on the record or otherwise documented, and thus I presume that if Davis' lawyer had chosen to, he would have been able to compel specific performance of the plea agreement.³ That his lawyer did not do so is some evidence that Davis and his trial counsel

---

³In support of the proposition that the ADA did not have the right to void Davis's agreement based on violation of a term not set forth, Petitioner cites *People v. Anonymous*, 942 N.Y.S.2d 500, 506 (App. Div. 2012), in which the Court noted that a trial judge should not have departed from a previously promised sentence where the defendant had committed misconduct "extraneous to the [plea/cooperation] agreement," as opposed to having violated "an express condition." *Anonymous* is distinguishable from Davis's situation because in that case the defendant had cooperated extensively on the street at risk to herself, entitling her to the benefit of her bargain, and the prosecution had concluded that she had satisfactorily complied with the agreement despite the extraneous misconduct. *See id.* at 504-07. Further, the *Anonymous* court

understood that staying out of further trouble was a condition of the agreement despite its not having been spelled out on the record. Indeed, Davis' appellate counsel, in her brief to the Appellate Division challenging the denial of Petitioner's motion pursuant to New York Criminal Procedure Law § 440.10, noted that it was customary that the County Court would condition cooperation on the cooperator avoiding further arrests. (ECF No. 56-8 at 24.)[4]

But assuming that the ADA could not properly revoke the deal, there is no evidence that Davis knew that. Both he and Whitesell are consistent (without contradiction from Davis's counsel or anybody else) that, at the time of Davis's testimony, Davis was under the belief that

---

stated that "depriving a defendant of the benefit of a plea agreement might be justified on the ground that the court and the People were entitled to insist on strict compliance with every term, whether express or implied," *id.* at 508 (cleaned up), suggesting that a defendant might not be entitled to specific performance even if the violation was of a condition that was not explicit (although in that situation he might be entitled to withdraw his guilty plea). But the New York courts have also found that "a defendant who has placed himself in a 'no-return' position by carrying out his obligations under a plea agreement" – that is, by cooperating – "is entitled to specific performance of that agreement in cases where no significant additional information bearing upon the appropriateness of the plea bargain later comes to the court's attention." *People v. Danny G.*, 61 N.Y.2d 169, 171 (1984). And where "the condition that defendant not be rearrested was not part of the plea agreement," and "the People did not demonstrate that, as a result of the arrest, defendant's future testimony was rendered valueless, the arrest alone does not constitute significant additional information bearing upon the appropriateness of the plea agreement that would allow the court to refuse to honor it despite defendant's cooperation." *People v. Harris*, 659 N.Y.S.2d 617, 617-18 (App. Div. 1997) (cleaned up). Thus, I assume for purposes of the Petition that, as a legal matter, Davis could have insisted on specific performance of the plea agreement despite his arrest.

[4]Counsel further argued that, in light of that custom, the ADA and the state judge could have believed that the arrest vitiated the deal, but it was possible that Davis knew that the no-rearrest term had been omitted from the record and testified in the expectation that the ADA would have to honor the deal. (ECF No. 56-8 at 24.) The Appellate Division saw no need to address this sheer speculation, finding simply that "the defendant's contention that his conviction was procured by fraud and misrepresentation on the part of the prosecutor was based on unsubstantiated and conclusory allegations." (ECF No. 56-10 at 1).

his plea deal had been rescinded.[5]  Thus, as the Magistrate Judge found, Petitioner's speculation did not show, in the face of sworn testimony from both parties, that Davis was lying when he said he believed his deal was off.  Petitioner's theory apparently is that despite having entered into the cooperation agreement with Davis, and despite having complied with his obligation to disclose that agreement to Petitioner's counsel, Whitesell decided to use Davis' arrest for petit larceny to deceive the jury by privately telling Davis that while the deal was secretly still on, Davis should falsely testify that it had been rescinded.  This farfetched theory lacks any supporting evidence.  The Magistrate Judge thus did not err in concluding that Petitioner had not shown that Davis testified falsely or that the prosecutor had violated his *Brady/Giglio* obligation.[6]

I thus need not reach Petitioner's objection, (Obj. ¶¶ 30-38), to Judge McCarthy's alternative conclusion that Petitioner had not shown that "any misrepresentation regarding whether Davis' deal was still in effect would have changed the outcome of the trial."  (R&R at 51.)[7]  Petitioner argues that Davis's credibility was crucial because Davis was an "unsavory," (Obj. ¶ 38),  crack-smoking, crack-selling "Crip for life" who had shot himself and lied about it, (*id*. ¶ 17), and the only witness who saw Petitioner with a gun and dressed in all black – as other witnesses had described the shooter – on the day in question, (*id*. ¶ 32).  The Magistrate Judge

---

[5]Thus, contrary to Petitioner's assertion, (Obj. ¶ 16), Whitesell's word is not the only evidence that the deal had been revoked, as Davis testified at trial to the same thing.  (And Whitesell's word was not evidence at the trial at all.  The jury was instructed that what the lawyers said was not evidence.  (JS Tr. at 456; Tr. 1052.))

[6]Based on that conclusion, she had no occasion to address whether the prosecutor should have known the testimony was false and whether it went uncorrected.

[7]Petitioner contradictorily argues that Judge McCarthy did not address whether the testimony was prejudicial, (Obj. ¶ 28), but that plainly is not the case, (*see* R&R at 49-51).

found that the ample corroboration of Davis, and the surrounding circumstances, made it unlikely that Davis's testimony about his agreement, even if false, could have affected the outcome. *See Shih Wei Su v. Filion*, 335 F.3d 119, 126-27 (2d Cir. 2003) (when prosecutor elicits testimony he knows or should know to be false, or allows such testimony to go uncorrected, conviction must be set aside unless there is "'no reasonable likelihood that the false testimony could have affected the judgment of the jury'") (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)).

While Davis was the only witness who testified to seeing Petitioner with a gun on the day of the murder, there were photographs of and testimony regarding his possession of the same caliber of gun days before. (Tr. 354-60, 681-89.) The testimony included that of an eyewitness who saw and photographed Petitioner with the gun, (Tr. 354-363), and that of a police officer who described an interview in which Petitioner swore on the life of his godchild that he had never held a gun in his life, until confronted with the photograph, whereupon he admitted to holding it and confirmed it was a real gun, (Tr. 589-90, 618). Likewise, while witnesses described the shooter as dressed all in black, including a bandana, (Tr. 97, 109, 241-42), and Davis was the only one who identified Petitioner as being dressed that way on the day of the murder, (Tr. 444-45, 451), black clothing – including a black bandana hidden under a mattress in Petitioner's room, (Tr. 251-52, 579), and black pants in a garbage can behind the house, (Tr. 281-82, 579) – was seized from Petitioner's residence shortly after the shooting, (Tr. 249-51, 269-73). Other witnesses described the distinctive hair of the shooter, in terms fitting Petitioner, (Tr. 90-91, 102, 156-57, 221-22, 237, 299, 441), and a jailhouse lawyer[8] testified to how Petitioner, in

---

[8] Although the inmate-witness disclaimed being a "jailhouse lawyer," (Tr. 861), he admitted that he gave Petitioner legal advice, did legal research for him, reviewed DNA reports related to his case and discussed the witness statements Petitioner had received, (Tr. 835-38, 861-

the course of seeking help with his case and discussing his options, admitted to having shot the victim while trying to rob him and provided details that lined up with Davis' account, (Tr. 832-38.)[9]

Further, the jury was aware of Davis' association with, and motive to curry favor with, the prosecution: he testified that the District Attorney had been paying for his hotel, (Tr. 460-61, 464-65), and that a detective had been paying for his meals, (Tr. 465-67). In addition, the jury knew that Davis had testified in the grand jury as part of his plea deal with the prosecution, after which he was released from prison, (Tr. 434-35, 510, 533-35, 547), and it could easily infer from the lack of impeachment that his trial testimony was consistent with his grand jury testimony (unlike that of other witnesses who were impeached with their grand jury testimony),[10] so it was aware that that testimony had been generated under the terms of the agreement. The jury thus had ample evidence from which to evaluate his motives.

---

64).

[9] Petitioner attacks Davis's credibility, and accuses the prosecutor of misconduct, because Davis and the jailhouse lawyer described Petitioner fighting with the victim's companion, whereas other witnesses described a more brief run-in or tussle. (Obj. ¶¶ 32-33.) Such minor discrepancies are commonplace and hardly suffice to show that either Davis or the jailhouse lawyer would have been disbelieved were the terms of Davis's plea deal not misrepresented. All witnesses agreed that in the course of the contact, Petitioner tore the companion's tank top.

[10] The only respect in which Davis was impeached with his grand jury testimony was that he testified at trial that he had seen Petitioner with a gun but did not know the caliber, but told the grand jury it was a thirty-eight caliber. (Tr. 551-54.) He was not impeached with respect to his account of having seen Petitioner leave the house in all-black clothing, hearing a shot, seeing Petitioner in the street, seeing Petitioner return to the house trembling and upset, and hearing Petitioner admit that the gun went off while Petitioner was trying to rob the victim. (Tr. 443-50.)

9

Moreover, the court instructed the jury that it should carefully scrutinize the testimony of a witness who may hope for a benefit, (Tr. 1065-66),[11] and it was obvious, notwithstanding Davis' belief that the deal was off, that anyone in his position would still have a motive to please the ADA in hopes that the ADA would be helpful to him in the future.[12]  Indeed, Petitioner's counsel specifically argued in summation that even though Davis and the ADA both said that Davis no longer had a cooperation agreement, "[t]hey can still give him a misdemeanor and time served just like they promised in the [c]ooperation [a]greement. . . . I guarantee you Calvin Davis is going to get the same deal he signed up for." (Tr. 1016.)

Davis was undoubtedly an important witness, and his criminal history and previous false statements – all known to the jury, (Tr. 428-34, 437, 468-81, 483-519) – were fertile grounds for attacking his credibility. Ultimately I need not decide whether, even if Petitioner's speculation about the status of the cooperation deal were correct, the corroboration of his testimony and the

---

[11]Petitioner discounts the significance of this instruction because it was a "generic instruction[]," (Obj. ¶ 36), that did not focus on "Davis's state of mind when he had a plea agreement in place," (*id.*). First, the instruction was in fact given as part of instruction specific to Davis. (Tr. 1065-66.) Second, even if it were merely a generic instruction, it is hard to see why that would matter. The instruction told the jury to scrutinize testimony in terms applicable to Davis, and his counsel could have – and did, (Tr. 1010-11, 1014-19, 1022-23) – argue at length about Davis' motives. Third, in addition to the Davis-specific instruction to scrutinize his testimony "in the light of any benefit he has received or been promised or of which he may have some hope," (Tr. 1066), the court also gave a general instruction, also applicable to Davis, that the jury should consider, in evaluating credibility, whether the witness had any relationship that would bias the witness toward one side or the other, (Tr. 1060).

[12]ADA Whitesell in summation acknowledged as much, stating, "Calvin Davis may hope that he doesn't go to state prison, but even he doesn't know, and he didn't know either when he came here and testified about this case." (Tr. 1032.) Davis's hope for the prosecutor's help was also exemplified by his testimony that after his petit larceny arrest, he asked the police to call ADA Whitesell because he hoped Whitesell could help him out, (Tr. 481-82), and that Whitesell came to the police station but would not help Davis get released, leaving them angry at one another, (Tr. 550).

plentiful evidence of his incentives would mean that this is the rare case in which false testimony about a witness's agreement nevertheless presents no reasonable likelihood that false testimony in that regard could have affected the jury's judgment. *See Shih Wei Su*, 335 F.3d at 127, 129; *Jenkins v. Artuz*, 294 F.3d 284, 295 (2d Cir. 2002). Likewise I need not determine if there is any reasonable likelihood that if Petitioner's theory were true and disclosed, the result of the proceeding would have been different. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (undisclosed impeachment evidence is material only if there is a reasonable probability – a probability sufficient to undermine confidence in the outcome – "that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"). As noted, even if false information regarding Davis' deal could have affected the jury's decision, the claim nevertheless fails because Petitioner has not shown that Whitesell's and Davis's account of the state of the agreement at the time of trial was false, or even provided contrary evidence that would warrant a hearing. *See Martinez v. Zon*, No. 04-CV-6506, 2008 WL 10659366, at *2 (W.D.N.Y. Mar. 25, 2008); *Savinon v. Mazucca*, No. 04-CV-1589, 2005 WL 2548032, at *39 (S.D.N.Y. Oct. 12, 2005), *report and recommendation adopted*, 2006 WL 2669331 (S.D.N.Y. Sept. 18, 2006), *aff'*, 318 F. App'x 41 (2d Cir. 2009).[13] Thus I do not distrurb the Magistrate Judge's conclusion that the state court decisions rejecting the false testimony, prosecutorial misconduct and *Brady/Giglio* claims did not involve an unreasonable application of, nor were contrary to, clearly established law.

Finally, Petitioner objects to the Magistrate Judge's statement, in concluding that she need not reach Petitioner's due-diligence argument, that his case was different from *Shih Wei Su*,

---

[13] The Court will send Petitioner copies of the unpublished decisions cited in this Order.

335 F.3d 119.  (R&R at 51.)  This *dictum*, in the course of a discussion that favored Petitioner by saying that his claim would not be denied based on lack of diligence (despite his waiting until 2017 to raise with the state court the claim prompted by Davis' sentencing in 2008), had no effect on the recommendation in the R&R and need not be addressed here.

      Thus, for the reasons stated above, I overrule Petitioner's objections.  In addition, I have reviewed the portions of the R&R to which no objection has been lodged and find no clear error.  The petition is denied.  Because reasonable jurists would not find it debatable that Petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).  The Clerk of Court is respectfully directed to send a copy of this Order to Petitioner, and close the case.

Dated: January 27, 2022
       White Plains, New York

                                                 */s/ Cathy Seibel*
                                                 CATHY SEIBEL, U.S.D.J.